UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEOFFREY VARGA, AS VOLUNTARY LIQUIDATOR OF HIMELSEIN MANDEL OFFSHORE LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>TELEIOS LS HOLDINGS DE, LLC, TELEIOS PF LOANS DE, LLC, and OAKTREE CAPITAL MANAGEMENT, L.P.,<br><br>Defendants. | Case No.: 23-cv-01464<br><br>**COMPLAINT** |

Plaintiff Geoffrey Varga, as Voluntary Liquidator of Himelsein Mandel Offshore Limited ("Plaintiff"), by and through his undersigned counsel, as and for his Complaint against Teleios LS Holdings DE, LLC ("Teleios Holdings"), Teleios PF Loans DE, LLC ("Teleios PF" and, together with Teleios Holdings, "Teleios"), and Oaktree Capital Management, L.P. ("Oaktree") (collectively, "Defendants"), states as follows:

## NATURE OF THE ACTION

1. This action arises out of Defendants' material and unjustified breach of an Asset Purchase Agreement entered into between Himelsein Mandel Offshore Limited ("HMO"), HM Ruby Fund, L.P. ("HM Ruby" and, together with HMO, the "Fund"), Gorham Holdings, LLC ("Gorham"), and Quantlife, LLC ("Quantlife") (collectively, "Sellers"), and Defendants dated November 2, 2011 (the "APA"), pursuant to which Sellers sold a portfolio of life insurance policies and related loans to Defendants in exchange for an upfront payment of $6,630,375 due upon closing, plus additional post-closing payments to be made as specified in the APA (the "Additional Payment Amounts").

{N0566610.1}

2.       While Defendants made the initial upfront payment upon closing, Defendants have unjustifiably refused to pay any of the Additional Payment Amounts due and owing to Sellers in material breach of the APA.

3.       More specifically, as further discussed below, the APA requires Defendants to make the Additional Payment Amounts—which are based on the "total amounts in respect of Net Death Benefits received by [Defendants] with respect to Life Policies that are (or secure) Conveyed Assets"—upon satisfaction of certain Additional Payment Conditions.

4.       As described below, all Additional Payment Conditions have been satisfied in whole. As such, the Sellers were and are entitled to Additional Payment Amounts totaling $1,928,220.

5.       Defendants, however, unjustifiably refused to pay any of the Additional Payment Amounts to Sellers, despite repeated and due demand for same. Indeed, to date, Defendants have not paid any of the Additional Payment Amounts in material breach of the APA. Additionally, Defendants intentionally frustrated the intent and purpose of the Preferred Return provision of the APA—which generally provides that Sellers are entitled to receive additional payments beyond the Additional Payment Amounts upon the satisfaction of certain defined criteria, including Defendants receipt of profits totaling at least $50 million from the Conveyed Assets—by selling all remaining Conveyed Assets in the portfolio after receiving nearly $45 million in profits to deliberately avoid the Preferred Return payment triggers.

6.       Defendants—who are managed and controlled by Oaktree, one of the largest distressed securities investors in the world with approximately $164 billion in assets under management—have made tens of millions of dollars from the portfolio of life insurance policies and related loans acquired from Sellers. Rather than abide by the contractual terms governing the

parties' relationship, Defendants have materially breached the APA to the express detriment of Sellers and Plaintiff.

7. In August 2022, Plaintiff, as Voluntary Liquidator of HMO, was assigned all rights and claims to pursue all causes of action arising out of Defendants' material breach of the APA.

8. Accordingly, Plaintiff brings this action seeking monetary damages to redress Defendants' material and continued breach of the APA.

## THE PARTIES & RELEVANT NON-PARTIES

9. HMO is a company incorporated under the laws of the Cayman Islands with its registered office located at Kroll, Harbour Centre, 42 North Church Street, P.O. Box 10387, George Town, Grand Cayman, KY1-1004.  Wayne Himelsein, an individual domiciled and residing in Los Angeles, California, was the founder and principal of Himelsein Mandel Advisors LLC, the investment adviser of the Fund.  On March 23, 2012, HMO was placed into voluntary liquidation in the Cayman Islands and, in due course, Geoffrey Varga ("Varga") and Mark Longbottom ("Longbottom") were appointed as Joint Voluntary Liquidators to oversee the voluntary liquidation of HMO.  On October 6, 2021, Longbottom resigned as a joint voluntary liquidator of HMO, with Varga continuing as the sole Voluntary Liquidator.  Pursuant to a Deed of Settlement and Release dated August 15, 2022 ("Deed of Settlement"), Varga, as Voluntary Liquidator of HMO, was assigned all rights to pursue all claims and causes of action against Defendants arising out of Defendants' breach of the APA.  Varga is domiciled in Portugal.

10. Teleios Holdings is a limited liability company organized and existing under the laws of the State of Delaware.

11. Teleios PF is a limited liability company organized and existing under the laws of the State of Delaware.

12.     Oaktree is a publicly traded global asset management firm specializing in alternative investment strategies, with its principal place of business located in the New York, New York.  According to its website, as of March 31, 2022, Oaktree has approximately $164 billion in assets under management.  At all relevant times, Oaktree managed and continues to manage Teleios.  By virtue of Oaktree's management and control of Teleios, Oaktree is both closely related to Teleios and an intended third-party beneficiary of, and received substantial benefits from, the APA, such that it was reasonably foreseeable at the time of execution of the APA that Oaktree would be by bound by its terms.  To this end, Oaktree played an active, prolonged, and material role in the events giving rise to this litigation, including without limitation: (a) engaging in negotiations on behalf of Teleios regarding the execution of contracts and the APA; (b) generating reports with regard to the life insurance policies and other assets conveyed pursuant to the APA; (c) retaining counsel to provide advice with regard to the amounts owed pursuant to the APA; and (d) communicating with Sellers and Plaintiff concerning the amounts owed pursuant to the APA.  Upon information and belief, Oaktree maintains an ownership interest in Teleios.

13.     HM Ruby is a limited partnership organized and existing under the laws of the State of Delaware.  HM Ruby is one of the identified Sellers in the APA.  Pursuant to the Deed of Settlement, HM Ruby assigned to Varga, as Voluntary Liquidator of HMO, all rights to pursue all claims and causes of action against Defendants arising out of Defendants' breach of the APA.

**JURISDICTION & VENUE**

14.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 as the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different states and/or citizens of a State and citizens of a foreign state.

15. Venue is proper in this Court pursuant to § 9.02(b) of the APA, which expressly provides that each of the parties to the APA "irrevocably submits to the non-exclusive jurisdiction of any federal or state court sitting in the county and State of New York in respect of any action or proceeding arising out of or in connection with this agreement." That Section further provides that each party to the APA "irrevocably waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any such proceedings in any such court and any claim that any proceeding brought in any such court has been brought in an inconvenient forum."

## FACTS COMMON TO ALL CAUSES OF ACTION

A. **Background**

16. Beginning in or around 2005, Himelsein Mandel Advisors LLC, acting on behalf of the Fund, began acquiring a sizeable portfolio of life insurance policies and related loans as part of an overall investment strategy. More specifically, HM Ruby purchased life insurance policies ("Life Policies") and funded loans that secured Life Policies (also known as Premium Finance Loans) from and to policy holders based on a variety of factors including, among other things, the retained death benefit of the policy, the length of the policy term, and the life expectancy and health status of the insured.

17. In or around March 2011, Himelsein Mandel Advisors LLC (on behalf of the Fund) and Defendants began negotiations about the possibility of selling all or a portion of the portfolio of Life Policies and Premium Finance Loans of the Fund to Defendants. In or around this time, the parties executed a term sheet setting forth the overall terms and structure of the proposed purchase while providing for a period of due diligence to be conducted by Defendants related to the underlying assets to be conveyed. During this due diligence period, Oaktree assumed from the

Fund all obligations to pay the premiums on all Life Policies that it was considering purchasing from the Fund.

18. Over the course of approximately seven months, the parties negotiated the terms of the APA. Ultimately, after significant back and forth, on November 2, 2011, the parties agreed to the terms of the sale of the Conveyed Assets (as defined in the APA and discussed below) and executed the APA. For those Life Policies that Defendants chose not to acquire via the APA, Oaktree failed to pay the premiums on such Life Policies, causing such Life Policies to lapse.

19. On March 23, 2012, after the execution of the APA, but while the terms of the APA were still in effect, HMO was placed into voluntary liquidation in Grand Cayman. Varga (and initially with Longbottom) was appointed to oversee the voluntary liquidation of HMO and worked in conjunction with Himelsein Mandel Advisors LLC to ensure the terms of the APA were effectuated and all payments due and owing to Sellers were made in due course. Subsequently, pursuant to the Deed of Settlement, Plaintiff was assigned the right to pursue all claims arising out of the APA. As described further below, Defendants failed to make all payments to Plaintiff in breach of the APA, thereby necessitating this action.

**B.   The APA**

20. The APA, a true and correct copy of which is annexed hereto as **Exhibit 1**, sets forth the terms of Defendants' agreement to purchase certain conveyed assets from Sellers.

21. Specifically, § 2.01(i) of the APA defines the "Conveyed Assets" being purchased by Defendants and expressly provides that Sellers agree to sell to Defendants, and Defendants agree to purchase from Sellers, all of Sellers' rights, title and interest in, to and under the Selected Assets identified on Schedule 1, Schedule 3, Schedule 4, Schedule 5, and Schedule 6, including certain related property including:

> [A]ll right, title and interest of the Sellers in, to and under all Life Policies identified as Selected Assets and owned by any Sellers or securing all Premium Finance Loans owned by any Seller and identified as Selected Assets . . . including the right to receive Net Death Benefits, dividends, distributions, refunds of premiums or other proceeds thereof from the related Issuing Insurance Companies, the right to borrow Policy Loans or make withdrawals of or in relation to the cash surrender values in relation thereto, any right to proceed against any state guarantee fund and other property and interests in property related thereto.

22. Pursuant to § 2.01(iv), Sellers also agreed to sell to Defendants all of Sellers' rights, title and interest in, to and under the Assets identified on Schedule 2 and 7, and certain related property including:

> [A]ll right, title and interest of the Sellers in, to and under all such Premium Finance and in the case of Himelsein Offshore, its Participations and other interests therein, including . . . the right to receive Net Death Benefits, dividends, distributions, refunds of premiums or other proceeds thereof from the related Issuing Insurance Companies, the right to borrow Policy Loans or make withdrawals of or in relation to the cash surrender values in relation thereto, any right to proceed against any state guarantee fund and other property and interests in property related thereto.

23. The assets listed in Schedules 1, 3, and 4 are Life Policies that are Conveyed Assets under the APA. Specifically, the APA defines Life Policy as "an entire policy of life insurance, or, as indicated by the context, a specific life insurance policy and/or a Trust Interest with respect to such life insurance policy." The assets listed in Schedules 2 and 7 are Life Policies that secure loans (*i.e.*, Premium Finance Loans), which are also Conveyed Assets. Therefore, the assets listed in Schedules 1-7 of the APA are the Conveyed Assets.

24. The total face value of the portfolio of Conveyed Assets at the time of execution of the APA was $530,430,000. The consideration for the Conveyed Assets includes the Upfront Payment, the Additional Payment Amounts, and the Preferred Return.[1]

---

[1] Contemporaneously with the execution of the APA, Sellers also entered into a term loan agreement with Defendants dated November 2, 2011 (the "Loan") for the total aggregate principal loan amount of $1 million. It is

25. The original term sheet outlining the material terms of the APA dated March 9, 2011, did not contemplate any Additional Payment Amounts whatsoever, instead providing only for an upfront payment representing 2% of the total death benefits of the Conveyed Assets (as specifically described in the APA). However, to allay any concerns Defendants had about potential challenges to and/or collection issues associated with the death benefits of the Conveyed Assets (as specifically described in the APA), Sellers agreed to accept an upfront payment of 1.25% of the total death benefits of the Conveyed Assets, with the remaining 0.75% of the total death benefits of the Conveyed Assets to be paid in the form of the Additional Payment Amounts.

26. To this end, § 2.01(c)(i) of the APA defines the Upfront Payment. This section required Defendants to pay to Sellers upon the closing of the APA the amount of $6,630,375. It is undisputed that Defendants made the Upfront Payment to Sellers upon closing of the APA. Defendants, however, failed to make the Additional Payment Amounts required by the APA.

27. The Additional Payment Amounts are defined in the Glossary of the APA as follows:

> "Additional Payment Amounts" means an amount equal to:
>
> (i) ten percent (10%) of the total amounts in respect of Net Death Benefits received by Purchasers with respect to Life Policies that are (or secure) Conveyed Assets during a Compliance Period; or
>
> (ii) five percent (5%) of the total amounts in respect of Net Death Benefits received by Purchasers with respect to Life Policies that are (or secure) Conveyed Assets during a Partial Non-Compliance Period; or
>
> (iii) zero during a Non-Compliance Period or during a Permanent Non-Compliance Period;
>
> *provided*, that, in the case of (ii) above, an additional five percent (5%) of the total amounts in respect of Net Death Benefits received by Purchasers with respect to Life Policies that are (or secure) Conveyed Assets shall be

---

undisputed that the Additional Payment Amounts are to first be applied to pay off the Loan, with all amounts remaining to be paid to Plaintiff, as assignee of Sellers.

held in escrow by Purchasers and shall be payable to Sellers during a subsequent Compliance Period;

*provided further*, that, the aggregate cumulative amount of Additional Payment Amounts payable to Seller shall not exceed seventy-five (75) basis points of the aggregate of the death benefits of all Life Policies that are (or secure) Conveyed Assets.

28. The Glossary defines Compliance Period as the time "from and after the date as of which all Additional Payment Conditions" (as defined in Section 2.01(c)(iv)) are satisfied.

29. Section 2.01(c)(iv) of the APA sets forth the Additional Payment Conditions that must be satisfied to enter a Compliance Period as follows:

1. Four or more Life Policies that each constitute a Selected Asset or, if such Selected Asset is a Premium Finance Loan, secure such Selected Asset, have matured (excluding Life Policy No. 93-747-327) since the date of execution of the OCM Loan Agreement or, if a Non-Compliance Event has occurred, since the Business Day on or after the termination of the most recent Non-Compliance Period; and

2. The total amounts received by Purchasers, in their capacity as such, in respect of the related death benefits of such Life Policies equals or exceeds Twenty Million ($20,000,0000); and

3. The amounts received by Purchasers, in their capacity as such, in respect of the related death benefits of the Life Policies described in clause (2) were all paid to Purchasers within one hundred (100) days from the date on which the related claim was submitted to the related Issuing Insurance Company; and

4. No Issuing Insurance Company described in clause (3) or that is the issuer of any Life Policy that is (or secures) a Selected Asset as to which the related Insured has not yet deceased contests, denies payment under, rescinds or otherwise challenges (judicially or otherwise), the validity, enforceability or ownership of any related Life Policy or Life Policies, or its obligation to pay death benefits thereunder.

30. The APA provides that a Non-Compliance Period "shall commence on the date of any Non-Compliance Event, in which case such Non-Compliance Period shall terminate on the first Business Day thereafter as of which all of the Additional Payment Conditions described in Sections 2.01(c)(iv)(1) through (3) are again satisfied."

31. The APA provides that no Additional Payment Amounts shall be due or payable before the first Compliance Period, during any Non-Compliance Period or after the commencement of a Permanent Non-Compliance Period. Once the Additional Payment Conditions are satisfied, the Additional Payment Amounts become due and owing to Sellers (and, by virtue of the assignment of HMO's and HM Ruby's claims, to Plaintiff).

32. The APA also includes additional consideration to Sellers in the form of the Preferred Return. Specifically, §§ 2.01(c)(ii) and (iii) provides, in pertinent part, that upon the satisfaction of certain conditions, including receipt by Defendants of return of its initial invested capital plus profits totaling at least $50 million from the Conveyed Assets, the Sellers are entitled to receive a 50% share of all cash flow from the Conveyed Assets from that point forward.

C. **Defendants' Breach of the APA**

33. After execution of the APA, Sellers received from Oaktree a duly issued quarterly report which reflected that at such time, the parties had entered into a Compliance Period because all Additional Payment Conditions had been satisfied. As such, the Additional Payment Amounts (less any amounts due under the Loan) were immediately due and payable to Sellers.

34. Pursuant to the APA, the Additional Payment Amounts due and owing total $1,928,220, calculated as follows: seventy-five (75) basis points of the aggregate of the death benefits of all Life Policies that are (or secure) Conveyed Assets, less the amounts due on the Loan at the time the Additional Payment Amounts became due and owing. Specifically, seventy-five (75) basis points of the aggregate of the death benefits of all Life Policies that are (or secure) Conveyed Assets (*i.e.,* $530,430,000) totals $3,978,100. That sum is then subtracted by the amounts due on the Loan at the time the Additional Payment Amounts became due and owing (*i.e.*, $2,049,800), which results in Additional Payment Amounts totaling $1,928,220.

35. Defendants, however, unjustifiably refused to pay any of the Additional Payment Amounts to Sellers.

36. Accordingly, Sellers made due demand for payment of $1,928,220, reflecting the Additional Payment Amounts then due and owing. Subsequently, Sellers and Oaktree engaged in significant email correspondence and telephonic discussions regarding Defendants' untenable refusal to pay the Additional Payment Amounts.

37. Ultimately despite due demand and despite any legitimate basis to withhold payment of the Additional Payment Amounts, Defendants have unjustifiably failed to pay any of the Additional Payment Amounts.

38. In addition to refusing to pay the Additional Payments, in or around 2018, Defendants sold all remaining Life Policies and Premium Finance Loans that were Conveyed Assets under the APA to certain third parties and realized substantial value therefrom. More specifically, after having received approximately $45 million in profits from the Conveyed Assets, and in a deliberate effort to avoid the triggering of the Preferred Return provisions of the APA, Defendants sold all of the remaining Conveyed Assets to certain third parties and refused to make any of the Preferred Return payments or otherwise provide compensation to Sellers in connection with the sale of these assets.

39. As a direct and proximate result of Defendants' material breach of the APA, Plaintiff has suffered, and continues to suffer, significant economic harm.

**FIRST CAUSE OF ACTION**
**(Breach of Contract)**

40. Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as though fully set forth herein.

41. The APA constitutes a valid and binding contract.

42. The Deed of Settlement constitutes a valid and binding assignment of the claims of against Defendants arising out of the APA. As such, Plaintiff has standing to pursue the instant claims against Defendants.

43. Sellers, and thereby Plaintiff, duly performed all of their obligations under the APA.

44. Defendants, however, materially breached the APA by failing to pay any of the Additional Payment Amounts due and owing. Defendants further breached the APA by causing all remaining Conveyed Assets to be sold to third parties to avoid payment of the Preferred Return.

45. Indeed, despite repeated demands by Sellers to Defendants for payment of all Additional Payment Amounts due and owing under the APA, Defendants have unjustifiably refused to pay any such sums in breach of the APA.

46. As a direct and proximate result of Defendants' material breach of the APA, Plaintiff has been injured in an amount to be determined at trial, but in no event less than $1,928,220.

**SECOND CAUSE OF ACTION**
**(Unjust Enrichment – In the Alternative)**

47. Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as though fully set forth herein.

48. Defendants clearly and unambiguously agreed to enter into the APA and agreed to pay the Additional Payment Amounts upon satisfaction of the Additional Payment Conditions.

49. Sellers, and Plaintiff as assignee, reasonably and foreseeably relied on Defendants' promises to perform in accordance with the APA.

50. Plaintiff, as assignee of Sellers, provided substantial value to Defendants, which Defendants acknowledged, accepted and benefited from.

51. Ultimately, however, Defendants failed to perform as promised and agreed to the clear detriment of Plaintiff, as assignee.

52. Accordingly, Defendants have been unjustly enriched, and will continue to be unjustly enriched, if permitted to continue to enjoy the benefits provided by Plaintiff without properly compensating Plaintiff.

53. As a direct and proximate result of Defendants' failure to perform as promised and agreed, Plaintiff has been damaged in an amount to be determined at trial, but in no event less than $1,928,220.

## THIRD CAUSE OF ACTION
### (Money Had and Received)

54. Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as though fully set forth herein.

55. Pursuant to the APA, Defendants are in possession of money duly belonging to Plaintiff.  Specifically, Defendants are in possession of the Additional Payment Amounts that are owed to Plaintiff, as assignee of the claims against Defendants for breach of the APA.

56. Defendants have benefited from the continued receipt of the Additional Payment Amounts that rightfully belong to Plaintiff.

57. It would be against equity and good conscience to permit Defendants to continue retain funds rightfully belonging to Plaintiff.

58. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been damaged in an amount to be determined at trial, but in no event less than $1,928,220.

## FOURTH CAUSE OF ACTION
**(Breach of The Implied Covenant of Good Faith and Fair Dealing)**

59. Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as though fully set forth herein.

60. The APA is a valid and enforceable contract. Inherent in any contractual relationship is the obligation not to act so as to deprive a party to the contract of the benefit of the contract.

61. By their acts and omissions, as described herein, Defendants acted in contravention of the covenants of good faith and fair dealing inherent in their contractual relationship with Sellers and Plaintiff.

62. Defendants have breached the implied covenant of good faith and fair dealing inherent in the APA by refusing to pay any of the Additional Payment Amounts. In addition, Defendants breached the implied covenant of good faith and fair dealing by selling all remaining Conveyed Assets to third parties to avoid payment of the Preferred Return.

63. As a direct and proximate result of Defendants' breaches of the covenant of good faith and fair dealing, Plaintiff has been damaged in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
**(Accounting)**

64. Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as though fully set forth herein.

65. Plaintiff, as assignee, entrusted Defendants to effectuate the terms of the APA in accordance with the unambiguous terms of the APA and the parties' intent, including paying all Additional Payment Amounts. Defendants, however, wrongfully refuse to pay the Additional Payment Amounts.

66. Plaintiff, by and through HMO and HM Ruby, repeatedly demanded an accounting in connection with the calculation and payment of the Additional Payment Amounts, which demand was unjustifiably refused.

67. Defendants are in exclusive possession, custody, and control of relevant financial documents, statements, and reports, including documents pertaining to the Conveyed Assets, which are necessary to the prosecution of this action.

68. Accordingly, Plaintiff is entitled to a full accounting from Defendants of all records and transactions related to the APA.

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

(a) On the First Cause of Action, damages in an amount to be determined at trial, but in no event less than $1,928,220;

(b) On the Second Cause of Action, damages in an amount to be determined at trial, but in no event less than $1,928,220;

(c) On the Third Cause of Action, damages in an amount to be determined at trial, but in no event less than $1,928,220;

(d) On the Fourth Cause of Action, damages in an amount to be determined at trial;

(e) On the Fifth Cause of Action, a full accounting of Defendants' books and records related to the Asset Purchase Agreement;

(f) Awarding Plaintiff pre-judgment and post-judgment interest, attorneys' fees, costs, expenses, and disbursements; and

(g) Awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated: New York, New York
February 22, 2023

McLAUGHLIN & STERN, LLP

By: */s/ Lee S. Shalov*
  Lee S. Shalov
  Jason S. Giaimo
260 Madison Avenue
New York, NY 10016
Tel.: (212) 448-1100
lshalov@mclaughlinstern.com
jgiaimo@mclaughlinstern.com

*Attorneys for Plaintiff*