UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
JOHN AYRES, AS VOLUNTARY                                    :
LIQUIDATOR OF HIMELSEIN MANDEL                              :
OFFSHORE LIMITED,                                           :
                                                            :          23-CV-1464 (VSB)
                                    Plaintiff,              :
                                                            :          **OPINION & ORDER**
                    - against -                             :
                                                            :
                                                            :
TELEIOS LS HOLDINGS DE, LLC,                                :
TELEIOS PF LOANS DE, LLC, and                               :
OAKTREE CAPITAL MANAGEMENT, L.P.,:
                                                            :
                                    Defendants.  :
                                                            :
------------------------------------------------------------X

Appearances:

Jason S. Giaimo
Lee S. Shalov
McLaughlin & Stern
*Counsel for Plaintiff*

John E. Schreiber
Kerry C. Donovan
Winston & Strawn LLP
*Counsel for Defendant*

VERNON S. BRODERICK, United States District Judge:

        Before me is the motion to dismiss Plaintiff's First Amended Complaint, which asserts

causes of action for (1) breach of contract; (2) unjust enrichment; (3) money had and received;

(4) breach of the implied covenant of good faith and fair dealing; and (5) accounting against

Teleios LS Holdings DE, LLC ("Teleios Holdings"), Teleios PF Loans DE, LLC ("Teleios PF"

and, together with Teleios Holdings, "Teleios Entities"), and Oaktree Capital Management, L.P.

("Oaktree" or "Defendant").  (*See generally* Doc. 58 ("AC").)  Because Oaktree has met the

standard for filing portions of certain materials under seal, its motion to seal is GRANTED.

Because Plaintiff fails to plausibly allege causes of actions for (1) unjust enrichment; (2) money

had and received; (3) breach of the implied covenant of good faith and fair dealing; and (4)

accounting, Defendant's motion to dismiss as to these causes of action is GRANTED. However,

because Plaintiff plausibly alleges that the Teleios Entities were the alter egos of Oaktree,

Defendant's motion to dismiss Plaintiff's breach of contract cause of action under this theory of

liability is DENIED.

## I.     Factual Background[1]

Defendant Oaktree Capital Management is a "publicly traded global asset management

firm" with its principal place of business in New York, New York and its global headquarters in

Los Angeles, California. (AC ¶ 13.) Defendants Teleios Holdings and Teleios PF ("Teleios

Entities") are limited liability companies organized and existing under the State of Delaware.

The sole member of both entities is "Teleios Parent Holdings, PT, LLC." (*Id.* ¶¶ 11–12.)

Plaintiff John Ayres is the voluntary liquidator of Himelsein Mandel Offshore Limited

("HMO"). (*Id.* ¶¶ 7–8.)

In approximately 2005, HMO began to acquire a "sizeable portfolio of life insurance

policies," on behalf of itself and a related company, HM Ruby Fund, L.P. ("HM Ruby"), (*id.* ¶

20), which "is a limited partnership organized and existing under the laws of the State of

Delaware, (*id.* ¶ 15. In March 2011, HMO began negotiating, on behalf of itself and HM Ruby,

(together, the "Fund"), with Oaktree about the possibility about selling some or all of this

portfolio. (*Id.* ¶ 21.) The Fund entered into a term sheet in approximately April 2011 that

---

[1] This factual background is taken from the allegations in Plaintiff's First Amended Complaint. (AC.) I assume the allegations set forth in the First Amended Complaint to be true for purposes of this motion. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). However, my references to these allegations should not be construed as a finding as to their veracity, and I make no such findings in this Opinion & Order.

outlined the parameters of a possible deal and expressed a willingness to negotiate a final contract in good faith.  (*Id.* ¶ 22.)  The term sheet also "provid[ed] for a period of due diligence to be conducted by Oaktree related to the underlying assets to be conveyed."  (*Id.* ¶ 23.)  While an asset purchase agreement was being negotiated, the Teleios Entities were created by Oaktree—Teleios Holdings in August 2011 and Teleios PF in September 2011.  (*Id.* ¶ 27.)

On November 2, 2011, HMO and three other entities—HM Ruby, Gorham Holdings, LLC ("Gorham"), and Quantlife, LLC ("Quantlife")—entered into the Asset Purchase Agreement ("APA") with the Teleios Entities, in which the Fund, Gorham, and Quantlife "sold a portfolio of life insurance policies and related loans to Defendants in exchange for an upfront payment of $6,630,375 due upon closing, plus additional post-closing payments to be made as specified in the APA."  (*Id.* ¶ 1.)

The APA listed seven schedules of "Conveyed Assets" which would be purchased by the Teleios Entities from the sellers.  (*Id.* ¶¶ 30–34.)  "The total face value of the portfolio of Conveyed Assets at the time of execution of the APA was $530,430,000."  (*Id.* ¶ 33.)  In exchange for the "Conveyed Assets," the Teleios Entities were to provide an "Upfront Payment" of "$6,630,375" and "Additional Payment Amounts" of 10% or 5% of the "total amounts in respect of Net Death Benefits" provided that certain "Additional Payment Conditions" were satisfied or partially satisfied.  (*Id.* ¶¶ 35–41.)  The APA also included a "Preferred Return" provision providing for a return of a certain percentage of any profits resulting from the "Conveyed Assets."  (*Id.* ¶ 42.)  When the "Additional Payment Conditions" were satisfied, the parties entered what was called a "Compliance Period," at which time the Teleios Entities were responsible for paying the "Additional Payment Amounts" "as Life Policies matured or were sold such that Defendants received Net Death Benefits from such policies."  (*Id.* ¶ 44.)

The signatories of the APA for Teleios Holdings were Kenneth Liang, a former Senior Managing Director and General Counsel of Oaktree, and Richard Goldstein, a current Managing Director and Head of Capital Markets of Oaktree.  (*Id.* ¶ 11.)  The signatories of the APA for Teleios PF were Kenneth Liang and Aaron Bendikson, a former Managing Director of Oaktree. (*Id.* ¶ 12.)  The Teleios Entities have the same principal place of business as Oaktree Capital. (*Id.* ¶¶ 11–12.)

On March 23, 2012, HMO was placed into voluntary liquidation in Grand Cayman.  (*Id.* ¶ 29.)  Geoffrey Varga was appointed voluntary liquidator of HMO and was "assigned all rights and claims to pursue all causes of action arising out of Defendants' material breach of the APA. On May 30, 2023, John Ayres [] was appointed and substituted as Voluntary Liquidator of HMO."  (*Id.* ¶ 7.)

Defendants, despite being in a Compliance Period, "refused to pay any of the Additional Payment Amounts to Sellers," and have "failed to pay any of the Additional Payment Amounts." (*Id.* ¶¶ 46, 48.)  According to Plaintiff, these failed payments total $1,928,220 and Plaintiff alleges this failure puts the Teleios Entities in material breach of the APA.  (*Id.* ¶¶ 2–4.) Defendants "[i]ntentionally frustrated the intent and purpose of the" APA by "selling all remaining Conveyed Assets in the portfolio after receiving nearly $45 million in profits to deliberately avoid the Preferred Return payment triggers."  (*Id.* ¶ 5.)  Further, "in or around 2018, Oaktree caused the Teleios Entities to sell all remaining Life Policies and Premium Finance Loans that were Conveyed Assets under the APA to certain third parties and realized substantial value therefrom."  (*Id.* ¶ 49.)

Plaintiff alleges that the Teleios Entities were "mere alter egos of Oaktree," and so that Oaktree can be held liable for Teleios's obligations under the APA even though it was not a

signatory to the contract.  (*Id.* ¶ 6.)  Plaintiff claims that the Teleios Entities "were merely special purpose vehicles created by Oaktree for the limited purpose of acquiring and holding the portfolio of Life Policies and Premium Finance Loans that Oaktree acquired from Sellers."  (*Id.* ¶ 52.)  Plaintiff alleges "substantial overlap between the officers, directors, and personnel of Oaktree and Teleios."  (*Id.* ¶ 53.)  Further, the APA signatories for the Teleios Entities were all Oaktree officers or employees at the time of signing, (*id.* ¶ 54), and Oaktree "exercised complete discretion and control over Teleios in connection with the negotiation and execution of the APA."  (*Id.* ¶ 56.)  Oaktree "act[ed] as the purchaser of the assets," conveyed by the APA, and "for all intents and purposes, Oaktree was the true purchaser of the Conveyed Assets."  (*Id.* ¶¶ 60–61.)  Plaintiff also alleges Oaktree controlled and dominated the Teleios Entities after the APA was signed, managing every aspect of payments on and performance of the deal.  (*Id.* ¶¶ 62–64.)  "Oaktree also caused Teleios to be undercapitalized so as to remain, in essence, judgment proof," (*id.* ¶ 66), and "caused Teleios to dissolve without creating a proper reserve so as to remain, in essence, judgment proof," (*id.* ¶ 71.)

On November 6, 2020, Henry Orren, a vice president of Oaktree, filed a "Certification of Cancellation with the Secretary of State of the State of Delaware" for both Teleios Entities.  (*Id.* ¶¶ 11–12.)

## II.    <u>Relevant Procedural History</u>

On February 22, 2023, Geoffrey Varga filed his complaint against Oaktree and the Teleios Entities.  (Doc. 1.)  On April 25, 2023, Oaktree filed a motion to dismiss, (Doc. 20), accompanied by a memorandum of law, (Doc. 21), and a supporting declaration, (Doc. 22).  On May 16, 2023, Plaintiff Varga filed an application to amend his complaint and to adjourn the briefing schedule on the initial motion to dismiss, with Oaktree's consent.  (Doc. 28.)  On May

17, 2023, I granted Plaintiff's application.  (Doc. 29.)  On May 30, 2023, Plaintiff John Ayres

"was appointed and substituted as Voluntary Liquidator of HMO," (AC ¶ 7), and Varga then

filed a motion to substitute party, for Ayres to replace him as Plaintiff on June 28, 2023, (Doc.

37), accompanied by a memorandum of law, (Doc. 38), a supporting declaration, (Doc. 39), and

a proposed order, (Doc. 40).  On July 11, 2023, I granted Plaintiff's motion to substitute Ayres as

Plaintiff.  (Doc. 45.)

On July 21, 2023, Plaintiff filed a letter motion, requesting leave to file certain portions

of the forthcoming First Amended Complaint and accompanying exhibits under seal, because it

was to contain references to "certain documents produced by Oaktree which Oaktree designated

as confidential."  (Doc. 48.)  On July 24, 2023, I issued an Order granting Plaintiff's preliminary

letter motion to seal.  (Doc. 55.)  On July 24, 2023, Oaktree filed a letter requesting that "the

redactions and exhibits that Plaintiff proposed to file under seal" remain permanently under seal,

as they "contain sensitive strategic business information, which, if disclosed, could be used by

competitors or potential business partners to gain a competitive advantage."  (Doc. 54.)  On July

25, 2023, I issued an order providing Oaktree until August 4, 2023 to provide its position on

whether redacted materials filed in Plaintiff's Amended Complaint should remain under seal.

(Doc. 56.)

On August 4, 2023, Plaintiff filed his First Amended Complaint.  (AC.)  On the same

day, Oaktree filed a letter motion to seal Exhibit 8 to the Amended Complaint because it

"disclose[d] and detail[ed] the name of, and relationships between, each Oaktree fund entity,"

(Doc. 61), as well as corresponding references to it in the amended complaint, which are located

in paragraph 52, (AC ¶ 52).

On September 8, 2023, Oaktree filed a motion to dismiss the First Amended Complaint, (Doc. 63), accompanied by a memorandum of law, (Doc. 64 ("Mot.")), and a declaration from John E. Schreiber, (Doc. 65). On October 9, 2023, Plaintiff filed a memorandum of law in opposition, (Doc. 66 ("Opp'n")), along with a supporting declaration from Jason S. Giamo, (Doc. 67). On October 30, 2024, Oaktree filed a reply memorandum in support of its motion to dismiss. (Doc. 68 ("Reply").) On November 1, 2023, Plaintiff filed a letter addressing his citizenship and my jurisdiction, sitting in diversity, rebutting the jurisdictional concern raised by Oaktree in its reply brief for the first time. (Doc. 69.)

For the reasons that follow below, Defendant's motion to dismiss is GRANTED in part and DENIED in part.

### III.    Legal Standards

#### A. *Sealing*

There is a presumption of public access to anything that qualifies as a "judicial document," *i.e.*, a "filed item that is 'relevant to the performance of the judicial function and useful in the judicial process.'" *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 139 (2d Cir. 2016) (quoting *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). The Second Circuit has "expressly rejected the proposition that 'different types of documents might receive different weights of presumption based on the extent to which they were relied upon in resolving [a] motion.'" *Brown v. Maxwell*, 929 F.3d 41, 48 (2d Cir. 2019) (quoting *Lugosch*, 435 F.3d at 123).

However, "the Court must assess whether there are countervailing factors that legitimately counsel against disclosure of the judicial document, and balance those factors against the weight properly accorded the presumption of access," including "the privacy interests

of those resisting disclosure." *TileBar v. Glazzio Tiles*, 723 F. Supp. 3d 164, 209 (E.D.N.Y. 2024) (internal quotation marks omitted). "The party seeking to maintain the seal carries the burden of demonstrating the need to seal." *Park Ave. Life Ins. Co. v. Allianz Life Ins. Co. of N. Am.*, No. 19-CV-1089, 2019 WL 4688705, at *2 (S.D.N.Y. Sept. 25, 2019) (citing *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 826 (2d Cir. 1997)).

"Although the protection of sensitive, confidential, or proprietary business information is a countervailing interest that can militate in favor of sealing, conclusory statements that documents contain confidential business information are insufficient to justify sealing." *Johnson as Tr. of Johnson Fam. Tr. v. Saba Cap. Mgmt., L.P.*, No. 22-CV-4915, 2022 WL 8024206, at *1 (S.D.N.Y. Oct. 14, 2022) (internal quotation marks and citations omitted). "Courts in the Second Circuit" will allow for sealing and redaction to "protect[ ] from disclosure proprietary, sensitive, and confidential business information," *Markowitz v. KBI Servs.*, No. 21-MC-397, 2021 WL 4555833, at *2 (S.D.N.Y. Oct. 5, 2021) (collecting cases where sealing was appropriate because, among other reasons, "documents contained company's proprietary marketing strategies, product development, costs and budgeting information" (citation omitted)), but the party seeking sealing must show why the information in question should be protected from disclosure. *See Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc.*, No. 15-CV-211, 2025 WL 444873, at *2 (S.D.N.Y. Feb. 10, 2025) (granting request to seal when moving party met "the burden of showing" "limited redactions to specific information within the documents," were appropriate when requests were "narrowly tailored").

## B. *Jurisdiction*

District courts have "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States." 28 U.S.C. § 1332(a). "A party invoking the jurisdiction of the

federal court has the burden of proving that it appears to a 'reasonable probability' that the claim is in excess of the statutory jurisdictional amount." *Tongkook Am., Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 784 (2d Cir.1994) (quoting *Moore v. Betit*, 511 F.2d 1004, 1006 (2d Cir.1975)). "Where a statutory liquidator brings a case on behalf of a company, the citizenship of the liquidator rather than that of the company represented, is determinative for diversity purposes." *Reliance Ins. Co. v. First Class Coverage, Inc.*, No. 05-CV-2269, 2005 WL 2276877, at *2 (S.D.N.Y. Sept. 14, 2005). "A court must dismiss an action whenever it appears that the court lacks jurisdiction of the subject matter.  Challenge to a court's subject matter jurisdiction may be raised at any time during the litigation." *United Nat. Ins. Co. v. Waterfront N.Y. Realty Corp.*, 907 F. Supp. 663, 667 (S.D.N.Y. 1995) (internal quotation marks omitted and cleaned up).

## C.  *Motion to Dismiss*

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner*, 496 F.3d at 237.  "A complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (internal quotation marks omitted).  A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  Finally, although all allegations contained in a complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.*

## IV.    Discussion

### A.  *Sealing*

In its motion to seal, Defendant Oaktree argues that its sealing "requests are narrowly tailored to achieve the aim of preventing legitimate competitive harm to Oaktree, as only the information necessary to prevent that harm is proposed for redaction."  (Doc. 61 at 2.)  Plaintiff did not object to the sealing request.

Here, I find that the countervailing business interests provided by Oaktree regarding the disclosure of competitively sensitive information and the confidential structure of its operations detailed in Exhibit 8 are adequate for Oaktree to meet its burden to keep the exhibit and the language discussing the exhibit under seal.  *See Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 511 (S.D.N.Y. 2015) (allowing filings in redacted form where "Plaintiffs' proposed redactions are generally limited to specific business information and strategies, which, if revealed, 'may provide valuable insights into a company's current business practices that a competitor would seek to exploit.'" (quoting *Encyclopedia Brown Prods., Ltd. v.*

*Home Box Off., Inc.*, 26 F. Supp. 2d 606, 614 (S.D.N.Y. 1998))).  The redactions proposed by

Oaktree are narrowly tailored to avoid the disclosure of commercially sensitive confidential

information and outweigh the presumption of accessibility that inheres to the First Amended

Complaint and its exhibits.  *See Lugosch*, 435 F.3d at 120 ("[D]ocuments may be sealed if

specific, on the record findings are made demonstrating that closure is essential to preserve

higher values and is narrowly tailored to serve that interest." (quoting *Matter of New York Times

Co.*, 828 F.2d 110, 116 (2d Cir. 1987) (alteration in original))).

Oaktree's motion to seal filed at Doc. 61 is GRANTED.

### B.  *Jurisdiction*

In its reply brief, Defendant raises for the first time the argument that I may lack diversity

jurisdiction over this matter because Plaintiff may be a U.S. citizen domiciled in Guernsey,

United Kingdom, and therefore outside of the ambit of §1332.  (Reply 1–2.)  I consider the issue

of diversity jurisdiction despite it being raised for the first time in Oaktree's reply since subject

matter jurisdiction can be raised at any time.  *See United Nat. Ins. Co.*, 907 F. Supp at 667.

Because Plaintiff has adequately addressed this issue and established that he is a foreign citizen

in his supplemental letter filing and declaration, (Docs. 69, 69-1), I find that I have diversity

jurisdiction over this matter.

### C.  *Choice of Law*

"In a diversity case, we apply the choice of law rules of the forum state—in this case

New York—to determine which law governs alter ego or piercing the corporate veil analysis."

*Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997).  "[T]he first step in

any case presenting a potential choice of law issue is to determine whether there is an actual

conflict between the laws of the jurisdictions involved."  *Beth Israel Med. Ctr. v. Horizon Blue*

*Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 582 (2d Cir. 2006) (quoting *Matter of*

*Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223 (1993)).

"Generally, New York courts will enforce a choice-of-law clause so long as the chosen

law bears a reasonable relationship to the parties or the transaction." *Fireman's Fund Ins. Co. v.*

*Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 641 (2d Cir. 2016) (quoting *Welsbach Elec. Corp. v.*

*MasTec N. Am., Inc.*, 7 N.Y.3d 624, 629 (2006). Here, the APA provides for all issues of

contractual interpretation to be governed by New York Law. APA § 9.02. ("This Agreement

Shall in all respects be governed by and construed in accordance with the internal laws of the

state of New York, without reference to its conflicts of laws provisions (other than Section 5-

1401 of the New York General Obligations Law), and the obligations, rights, and remedies of the

parties hereunder shall be determined in accordance with such laws." (cleaned up)). Oaktree's

principal place of business is in New York, (AC ¶ 13), which satisfies the "reasonable

relationship" test. Restatement (Second) of Conflict of Laws § 187 ("[P]arties will be held to

have had a reasonable basis for their choice [of law] . . . when [the chosen state] is that where

performance by one of the parties is to take place or where one of the parties is domiciled or has

his principal place of business."); *see also S. Leo Harmonay, Inc. v. Binks Mfg. Co.*, 597 F. Supp.

1014, 1025 (S.D.N.Y. 1984) (describing New York's approach to contractual choice-of-law

clauses as being "stated succinctly" in the Restatement (Second) of Conflict of Laws § 187),

*aff'd sub nom. Harmonay Inc. v. Binks Mfg. Co.*, 762 F.2d 990 (2d Cir. 1985). Choice of law

clauses apply to claims that sound in both contract and quasi-contract. *See First Horizon Bank v.*

*Intercontinental Cap. Grp., Inc.*, No. 23-CV-9380, 2025 WL 1548787, at *4–5 (E.D.N.Y. May

30, 2025) (applying the same law chosen by the parties to quasi-contract claims as contract

claims).

However, "the issue of piercing the corporate veil is collateral to [a] contract, and thus this Court is not bound by the choice of law provision," in the APA. *Blue Whale Corp. v. Grand China Shipping Dev. Co.*, 722 F.3d 488, 496 (2d Cir. 2013) (quoting *United Trade Assocs. Ltd. v. Dickens & Matson (USA) Ltd., Inc.*, 848 F. Supp. 751, 759 (E.D. Mich. 1994)) (collecting cases). Because the "corporate identity inquiry is indeed distant from" the questions of contractual interpretation covered by a choice of law provision, *see id.*, I apply traditional choice of law principles to determine which law to apply in adjudicating the alter ego issue. *See Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993) ("[C]hoice of law provisions in the [contract] are irrelevant" to veil-piercing inquiry, because "[t]he issue is the limited liability of shareholders of [parent] corporation—not [subsidiary's] obligations under the [contract]"). New York choice of law rules provide that generally "the law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks omitted)

Because Teleios Holdings and Teleios PF are Delaware LLCs, the question of whether to pierce the corporate veil in this case is a question of Delaware law. *See A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, 241 F. Supp. 3d 461, 474 (S.D.N.Y. 2017) ("Because the [Subsidiary] is a Delaware LLC the Court will look to Delaware law to address [Plaintiff's] argument that [Subsidiary] is [Parent's] alter ego" (citation omitted)); *see also Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 975 F. Supp. 2d 392, 401 (S.D.N.Y. 2013) ( holding that when "the subsidiary [] is a Delaware-based corporation, and [] the parent [] is an Indiana-based corporation. . . . Delaware law governs Plaintiff's veil-piercing attack," because "Plaintiff seeks to disregard the subsidiary's [] corporate form"); *Aaron Richard Golub, Esquire, P.C. v. Blum*,

13

No. 23-CV-10102, 2024 WL 1376436, at *3 (S.D.N.Y. Apr. 1, 2024) (explaining that whether to pierce the corporate veil of an LLC that was a California entity was an inquiry governed by California law). However, because "the standards for piercing the corporate veil are substantially similar under Delaware and New York law," I will also "rel[y] on cases applying New York veil-piercing law as persuasive authority." *Cohen v. Schroeder*, 248 F. Supp. 3d 511, 518 n.4 (S.D.N.Y. 2017), *aff'd*, 724 F. App'x 45 (2d Cir. 2018) (quoting *Wausau Bus. Ins. Co. v. Turner Const. Co.*, 141 F. Supp. 2d 412, 417 (S.D.N.Y. 2001)).

Successor liability is typically governed by the "law of the state of incorporation of the defendants to a claim for successor liability," not the state indicated by a contract's choice of law provision. *Planet Payment, Inc. v. Nova Info. Sys., Inc.*, No. 07-CV-2520, 2011 WL 1636921, at *7 (E.D.N.Y. Mar. 31, 2011) (not applying Tennessee law to successor liability claims arising from contract with Tennessee choice of law provision); *see also Tommy Lee Handbags Mfg. Ltd. v. 1948 Corp.*, 971 F. Supp. 2d 368, 378 (S.D.N.Y. 2013) ("As with piercing the veil, New York courts determining successor liability have similarly concluded that the state with the most interest is the defendant corporation's place of incorporation.") Oaktree is a "is a limited partnership organized under the laws of the state of Delaware with its principal place of business located at 333 South Grand Avenue, Los Angeles, California." (Doc. 19.) Therefore, Delaware law also applies to Plaintiff's successor liability claims. Because "both New York and Delaware recognize that when one company sells or transfers all of its assets to another company, the acquiring company generally does not become liable for the debts or liabilities of the seller/transferor," and apply the same test, I may refer to the New York cases cited by the parties. *Hayden Cap. USA, LLC v. Northstar Agri Indus., LLC*, No. 11-CV-594, 2012 WL 1449257, at *4 (S.D.N.Y. Apr. 23, 2012)

### D.  *Alter Ego*

One legal issue that may preclude complete dismissal of Plaintiff's claims is whether the Teleios Entities, signatories to the 2011 APA, were the alter egos of Defendant Oaktree.  As explained *supra* § 4.C, the law that governs whether to pierce the corporate veil of the Teleios Entities is Delaware Law.

Under Delaware law, to pierce the corporate veil, a Plaintiff must show that "(i) that 'the entities in question operated as a single economic entity,' and (ii) that 'there [is] an overall element of injustice or unfairness.'"  *A.V.E.L.A., Inc.*, 241 F. Supp. 3d at 475 (quoting *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 177 (2d Cir. 2008).  Such a plaintiff "faces a 'heavy burden,'" as "'Delaware courts . . . take the corporate form very seriously and will disregard it only in the exceptional case,'" *Partner Reinsurance Co. Ltd. v. RPM Mortg., Inc.*, 604 F. Supp. 3d 121, 204 (S.D.N.Y. 2022) (quoting *Nat'l Gear & Piston*, 975 F. Supp. 2d at 401–02), but "'[t]he alter ego inquiry under Delaware law is a fact intensive one,'" *McBeth v. Porges*, 171 F. Supp. 3d 216, 233 (S.D.N.Y. 2016) (internal quotation marks omitted), and is "not readily subject to resolution on a motion for judgment on the pleadings." *Credit Suisse Sec. (USA) LLC v. W. Coast Opportunity Fund, LLC*, Civ.A.No. 4380, 2009 WL 2356881, at *3 n.23 (Del. Ch. July 30, 2009).  Alter ego, under Delaware law, is a theory of liability that can be used to prove up breach of contract or other claims, not a separate cause of action in and of itself.  *See Nat'l Gear & Piston*, 975 F. Supp. 2d at 401–02 (applying Delaware law and explaining that alter ego is a theory of how Defendant could be "indirectly liable" for several claims, including breach of contract); *Soroof Trading Dev. Co. v. GE Fuel Cell Sys., LLC*, 842 F. Supp. 2d 502, 522 (S.D.N.Y. 2012) (similar).

### 1. Single Economic Entity

In analyzing whether the subsidiary and the parent operated as a single economic entity, courts applying Delaware law must consider:

> [w]hether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder.

*Fletcher*, 68 F.3d at 1458 (quoting *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, No. CIV. A. 1331, 1989 WL 110537, at *4 (Del. Ch. Sept. 19, 1989)).

The First Amended Complaint contains allegations designed to support the conclusion that Teleios and Oaktree are essentially a single economic entity, including that: "Teleios PF and Teleios Holdings [] were merely special purpose vehicles created by Oaktree for the limited purpose of acquiring and holding the portfolio of Life Policies and Premium Finance Loans that Oaktree acquired from Sellers," (AC ¶ 52); "there was [] substantial overlap between the officers, directors, and personnel of Oaktree and Teleios," (*id.* ¶ 53); Oaktree and the Teleios Entities "shared the same business address," (*id.* ¶ 55); Oaktree engaged in preliminary negotiations over the deal and drafted a term sheet before Teleios was formed, (*id.* ¶¶ 55–57); and "Oaktree [] caused Teleios to be undercapitalized so as to remain, in essence, judgment proof," (*id.* ¶ 66). Plaintiff also claims that various other aspects of the deal itself and Oaktree's subsequent conduct also support an inference that "Oaktree [] exercised complete discretion and control over Teleios in connection with the negotiation and execution of the APA." (*Id.* ¶ 67.)

Oaktree argues that the factors identified by Plaintiff in the First Amended Complaint are insufficient either individually or in combination to suffice for Plaintiff to pierce the corporate veil of the Teleios Entities under New York law. (*See* Mot. 9–13.) However, the law is clear

that the "list of factors [set out in *Fletcher*] is not exhaustive and no single factor is dispositive."

*Partner Reinsurance Co. Ltd.*, 604 F. Supp. 3d at 205 (quoting *Blair v. Infineon Techs. AG*, 720

F. Supp. 2d 462, 471 (D. Del. 2010)).  Therefore, it is not surprising that courts have found that

while some subset of these elements alone may be insufficient to prove alter ego in specific

circumstances, when identified in combination and as occurring at the same time, they still may

demonstrate "'exclusive domination and control . . . to the point that' the subsidiary 'no longer

ha[s] legal or independent significance of [its] own.'"  *Nat'l Gear & Piston*, 975 F. Supp. 2d at

402 (quoting *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d

1175, 1184 (Del. Ch. 1999)).  Typically, courts do seem to require more than one of the factors

from *Fletcher* to be adequately alleged to support a claim to pierce the corporate veil.  *See, e.g.*,

*De Sole v. Knoedler Gallery, LLC*, 139 F. Supp. 3d 618, 666 (S.D.N.Y. 2015) ("Here, there is

substantial evidence of (1) a mingling of . . . operations, and (2) a disregard of corporate

formalities."); *Blockchain Mining Supply & Servs LTD. v. Super Crypto Mining, Inc.*, No. 18-

CV-11099, 2022 WL 3155267, at *3 (S.D.N.Y. Aug. 8, 2022) ("factual allegations in

[Plaintiff's] complaint" of undercapitalization and siphoning funds, among other things,

demonstrated first prong of alter ego test).

Whether applying Delaware law or New York law, facts like "shar[ing] a business

address," "involve[ment] in the negotiations of the APA," or that "the Teleios Entities were

created for the purpose of purchasing and servicing the acquired assets," when considered in

isolation, cannot justify piercing the corporate veil.  (Mot. 10.)  However, when considered

together, these facts are circumstantial evidence supporting an alter ego finding.  *See De Sole*,

139 F. Supp. 3d at 666 ("[S]ignificant mingling of office space and infrastructure weighs in favor

of finding that [subsidiary] and [parent] operate as a single economic entity" under Delaware

law); *Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.*, 842 F.2d 1466, 1476 (3d Cir. 1988)

(explaining that in evaluating alter ego claims, courts consider the "adequacy of capitalization,

overlapping directorates and officers, separate record keeping, payment of taxes and filing of

consolidated returns, maintenance of separate bank accounts, level of parental financing and

control over the subsidiary, and subsidiary authority over day-to-day operations.").

      Here, I find that when the allegations in the First Amended Complaint that the Teleios

Entities were undercapitalized (*see* AC ¶¶ 66, 71; *see also infra* at 21), and that Oaktree had total

"control and dominance over its affiliate [] throughout the entire process," of conducting and

performing the at-issue transaction, *In re Sunbeam Corp.*, 284 B.R. 355, 367 (Bankr. S.D.N.Y.

2002), are accepted as true, as I must at this stage of the litigation, that Plaintiff adequately

pleads a claim to pierce the corporate veil in this instance.  Plaintiff alleges that Teleios "simply

functioned as a facade for" Oaktree and also claims that it was not "adequately capitalized for the

corporate undertaking."  *Fletcher*, 68 F.3d at 1458.  Oaktree, in its brief, seems to aver that the

corporate undertaking in question is merely the underlying transaction governed by the APA,

which occurred in 2014.  (Mot. 12–13.)  The Defendant appears to argue that because Plaintiff

does not allege that the Teleios Entities lacked enough funding to conduct the initial deal itself,

his claims must fail.  (Mot. 12, n. 6.)  However, Oaktree fails to identify, and I have not located,

any cases in the Circuit which impose such a limitation beyond one case holding that inadequate

capitalization must be alleged "during the relevant time period[]."  *See Atateks Foreign Trade*

*Ltd. v. Priv. Label Sourcing, LLC*, No. 07-CV-6665, 2009 WL 1803458, at *15 (S.D.N.Y. June

23, 2009)*, aff'd*, 402 F. App'x 623 (2d Cir. 2010).  Of course, that case does not hold, and I do

not find, that subsequent payments specifically contemplated by an initial contract are

necessarily not part of such a "relevant time period."  *Id.*

Indeed, courts interpreting Delaware law have held that "[w]hen determining whether a subsidiary was adequately capitalized, courts focus on the initial capitalization: 'whether a corporate entity was or was not set up for financial failure.'" *In re BH S & B Holdings LLC*, 420 B.R. 112, 136 (Bankr. S.D.N.Y. 2009) (quoting *George Hyman Constr. Co. v. Gateman*, 16 F. Supp. 2d 129, 152–53 (D. Mass. 1998), *aff'd as modified*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011)). Here, the Additional Payments were part of the underlying contract itself and made up approximately 37.5% of the total value in consideration received by sellers as part of the APA. (*See* AC ¶ 35.)  Parsing the "corporate undertaking" to include only the 2014 time frame and not the subsequent payments explicitly contemplated by the intent of the parties as manifested through their explicit contract is illogical and runs contrary to basic principles of contractual interpretation.  *See In re Autobacs Strauss, Inc.,* 473 B.R. 525, 552 (Bankr. D. Del. 2012) (finding that allegations that subsidiary "was grossly undercapitalized from the outset (and therefore at the time of each transfer or obligation)," not just the initial transfer or obligation, "warrant[ed] discovery on the issue of undercapitalization").

Therefore, the operative question is whether the Teleios Entities, when set up and established in August and September 2011, (AC ¶ 27), were created "with specific intent to escape liability for a specific tort or class of torts," *Cohen*, 248 F. Supp. 3d at 520 (quoting *Zubik v. Zubik*, 384 F.2d 267, 273 (3d Cir. 1967)), or whether, instead, they were merely established to broadly protect Oaktree from liability as part of the ordinary course.  *See id.* at 524–25 (determining the latter to be the case and granting summary judgment).  The former scenario warrants piercing the corporate veil, whereas the latter does not.

I am mindful in assessing these allegations and arguments that an "everyone is doing it defense," *Essar Steel Algoma Inc. v. Nevada Holdings, Inc.*, No. 17-MC-360, 2020 WL

2539031, at *3 (S.D.N.Y. May 18, 2020) (internal quotation marks omitted), does not save a parent company from the argument that its subsidiary was created for an improper purpose. In other words, just because creating a shell company for the purpose of conducting a transaction of this nature is an "arrangement [that is not] uncommon," (Mot. 11), in this industry, does not mean that the corporate veil cannot be pierced in this instance.

Although it is a close call, Plaintiff has done enough, at this stage of the litigation, to raise a plausible inference that the Teleios Entities were set up as alter egos to shield Oaktree from future default on its contractual obligations specifically contemplated by the APA and to therefore avoid executing the contract as written and as required. *Compare Partner Reinsurance Co. Ltd. v. RPM Mortg., Inc.*, No. 18-CV-5831, 2020 WL 6690659, at *8–11 (S.D.N.Y. Nov. 13, 2020) (*"Partner Reinsurance I"*) (accepting allegations "if expanded" that subsidiary "was undercapitalized" and "dominated and controlled" by parent as satisfactory, at the motion to dismiss stage, to state an alter ego claim), *with Partner Reinsurance Co. Ltd. v. RPM Mortg., Inc.,* 604 F. Supp. 3d 121, 204–08 (S.D.N.Y. 2022) (rejecting alter ego liability on the basis of the same allegations after a bench trial) ("*Partner Reinsurance II"*). It may be that Plaintiff will not be able to sustain his alter ego assertion after discovery, but at this stage of the litigation, Plaintiff has met his burden to plead that such a claim is plausible.

In *Partner Reinsurance I*, the court rejected a motion to dismiss alter ego claims, 2020 WL 6690659, at *9, against an entity that was ultimately determined to have "generally observed corporate formalities," "operated for well over 20 years as a mortgage lender, before being merged into" parent company, and that "was adequately capitalized and solvent." *Partner Reinsurance II,* 604 F. Supp. 3d at 205–06. In contrast to *Partner Reinsurance I and II*, the facts alleged by Plaintiff, *see supra* at 16, lend themselves even more strongly to an inference that the

subsidiaries at issue were "established to defraud [their] creditors or [for] [an]other improper purpose such as avoiding the risks known to be attendant to a type of business," *In re Opus E., LLC*, 528 B.R. 30, 59 (Bankr. D. Del. 2015) (quoting *Trs. of Nat. Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 197 (3d Cir. 2003)), *aff'd sub nom. In re: Opus E., LLC*, No. 09-12261, 2016 WL 1298965 (D. Del. Mar. 31, 2016), *aff'd sub nom. In re Opus E. LLC*, 698 F. App'x 711 (3d Cir. 2017).  It should be said that the risk of default and failure to pay the additional payments as contemplated by the initial agreement is obviously such an "attendant" risk.  It may be the case that, at summary judgment, Plaintiff will find himself unable to "point[] to any evidence that [subsidiaries'] capitalization 'was so minimal as to prove that [they were] sham entit[ies]'".  *Cohen*, 248 F. Supp. 3d at 521 (S.D.N.Y. 2017) (quoting *EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*, No. CIV.A. 3184, 2008 WL 4057745, at *13 (Del. Ch. Sept. 2, 2008)).  However, it also may be the case that the factual allegations in the First Amended Complaint, with the addition of evidence unearthed during discovery, will support a determination that the Teleios Entities were alter egos of Oaktree.  *See Blockchain Mining Supply & Servs.*, 2022 WL 3155267, at *3 ("[F]actual allegations in [Plaintiff's] complaint, reinforced by [] discovery, if proven true, would demonstrate that [subsidiary] is an alter ego of [parent].")

Defendant attempts to distinguish *Essar,* by claiming that there, unlike here, the parent company "immediately siphoned money out of a [subsidiary] company to avoid judgment." (Reply 5 (citing 2020 WL 2539031, at *3).)  However, it is black letter law that "[n]umerous factors come into play when discussing whether separate legal entities should be regarded as alter egos," and "[t]he legal test for determining when a corporate form should be ignored in equity cannot be reduced to a single formula."  *NetJets Aviation, Inc.*, 537 F.3d at 177 (quoting

21

*Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 989 (Del. Ch. 1987)); *see also*

*Blockchain Mining Supply & Servs.*, 2022 WL 3155267, at *3 ("[N]o single factor can justify a

decision to disregard the corporate entity . . . some combination of them is required" (internal

quotation marks omitted)).  In other words, the failure to allege siphoning is not dispositive for

Oaktree, any more than the allegations regarding interlocking directorates and shared office

space could be dispositive for the Plaintiff.  *See Vibes Int'l Inc., SAL v. Iconix Brand Grp., Inc.*,

No. 18-CV-11449, 2020 WL 3051768, at *8 (S.D.N.Y. June 8, 2020) (explaining that, under

New York law, "[a]llegations of complete ownership, common officers and personnel, and

shared office space" should be coupled with allegations "of an absence of corporate formalities,

undercapitalization, or orchestrated cash flow between the companies," to state a claim.)  At this

stage of the litigation, Plaintiff has sufficiently alleged that Defendant and its subsidiary

"operated as a single economic entity."  *In re BH S & B Holdings*, 420 B.R. at 134.

### 2.  Injustice or Unfairness

Additionally, Plaintiff must show, in order to make out an alter ego theory of liability,

that "the [subsidiary] corporation effectively must exist as a sham or shell through which the

parent company perpetrates injustice."  *Nat'l Gear & Piston*, 975 F. Supp. 2d at 406 (S.D.N.Y.

2013).  It is also well-established that "a plaintiff's underlying cause of action alone is

insufficient to satisfy the injustice requirement."  *Id.* (collecting cases).  However, under

Delaware law, "there is no requirement of a showing of fraud," to demonstrate injustice or

unfairness.  *Fletcher,* 68 F.3d at 1457 (citing *Harper v. Delaware Valley Broadcasters, Inc.*, 743

F. Supp. 1076, 1085 (D. Del. 1990), *aff'd*, 932 F.2d 959 (3d Cir. 1991)).

Here, unlike in *National Gear*, Plaintiff makes a separate showing apart from his

underlying cause of action.  As he explains in his brief, Plaintiff alleged that "Oaktree [] caused

Teleios to be undercapitalized so as to remain, in essence, judgment proof," (*id.* ¶ 66), and that it "thereafter caused Teleios to dissolve without creating a proper reserve so as to remain, in essence, judgment proof.  Oaktree abused the corporate form of Teleios for the purpose of harming Plaintiff," (*id.* ¶ 71).  Even though these allegations remain unproven, Plaintiff has earned the right to pursue them through discovery.  *See A.V.E.L.A., Inc.*, 241 F. Supp. 3d at 476 ("The Court recognizes that alter-ego theories of liability are generally fact intensive. And for that reason, whether an LLC's form should be disregarded is a question generally submitted to the jury.")  (internal quotation marks and citations omitted)).

Plaintiff notes in his brief that his allegations are here "premised on a wrongful act and not an allegation of fraud."  (Opp'n 15.)  "[U]nder Delaware law, 'a plaintiff need not prove that there was actual fraud but must show a mingling of the operations of the entity and its owner plus an 'overall element of injustice or unfairness.'"  *McBeth*, 171 F. Supp. 3d at 233 (quoting *NetJets Aviation, Inc.*, 537 F.3d at 176).  In other words, "[u]nder Delaware law, the requisite injustice or unfairness is not that the parent corporation committed an actual fraud or sham but just something that is similar in nature to fraud or a sham."  *Blair*, 720 F. Supp. 2d at. 471 (internal quotation marks omitted).

Courts differ on whether a heightened pleading standard is appropriate in cases where the predicate wrong for the second prong of the alter ego inquiry is fraud.  *Compare Gabriel Cap., L.P. v. NatWest Fin., Inc.*, 122 F. Supp. 2d 407, 434 (S.D.N.Y. 2000) *abrogated on other grounds by In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003) ("The heightened pleading requirement of Rule 9(b) applies to plaintiffs' attempt to pierce the corporate veil because their underlying allegations all relate to fraud."), *with Vorcom Internet Servs., Inc. v. L & H Eng'g & Design LLC*, No. 12-CV-2049, 2013 WL 335717, at *5 (S.D.N.Y.

Jan. 9, 2013) (applying Rule 8(a) to alter ego theory).  However, it is universally recognized that

when, as here, Plaintiff's claims allege "non-fraudulent wrongs, including . . . rendering

[subsidiaries] insolvent and engaging in self-dealing," claims predicated on an alter ego theory

"need not satisfy the heightened pleading requirements of Rule 9(b)."  *Caplan v. Dollinger*, 803

F. Supp. 3d 219, 235 (S.D.N.Y. 2025) (alterations adopted) (collecting cases).

Because Plaintiff makes a plausible allegation as to a separate wrong committed by

Oaktree, in addition to the underlying breach of contract claim that underlies this action, *i.e.*,

deliberately undercapitalizing its subsidiaries and rendering them judgment-proof so as to avoid

liability for default on the Additional Payments on the APA, (AC ¶¶ 66, 71), I find that he has

met his burden to allege the second prong of the alter ego test.  Because Plaintiff plausibly claims

that the Teleios Entities were alter egos for Oaktree, Defendant's motion to dismiss Plaintiff's

breach of contract cause of action, to the extent it is predicated on an alter ego theory, is

DENIED.

### E.  *"Intent to Be Bound" and Third-Party Beneficiary*

To the extent Plaintiff argues that Defendant "manifest[ed] an intent to be bound" by the

APA separate and apart from his alter ego claims, this argument fails.  Plaintiff continually refers

to Defendant as an "intended third-party beneficiary," of the APA throughout the First Amended

Complaint.  (AC ¶¶ 14, 72–77).[2]

---

[2] "New York has adopted the Restatement (Second) of Contracts ("Restatement") approach in assessing third-party beneficiary claims."  *Oost-Lievense v. N. Am. Consortium, P.C.*, 969 F. Supp. 874, 878 (S.D.N.Y. 1997), *adhered to on reconsideration*, No. 95-CV-0559, 1997 WL 401665 (S.D.N.Y. July 17, 1997) (citing *Septemberide Publishing, B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 679 (2d Cir. 1989).  This means that "(1) [u]nless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and . . .  (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."  *Id.* (quoting Restatement § 302).  "To reach that determination, we must examine the intent of the parties—as revealed in their agreement—and the surrounding circumstances."  *Septemberide Pub., B.V.*, 884 F.2d at  679.

However, third-party beneficiaries may not, in and of themselves, be held liable for breach of contract. Courts that have addressed this issue have "rejected the proposition that third-party beneficiaries may be sued for breach of a contract to which they are not parties." *Dish Purchasing Corp. v. Suncraft Techs., Inc.*, No. 22-CV-00127, 2023 WL 1801336, at *5 (D. Colo. Feb. 7, 2023) (collecting cases); *Focus Direct, Inc. v. Sekulow*, No. SA-02-CA-1175, 2003 WL 22143281, at *1 (W.D. Tex. Sept. 5, 2003) ("Defendants have not cited, and the Court has not found, any authority for the proposition that a third-party beneficiary may *be sued* for breach of a contract to which the beneficiary was not a party" (emphasis in original)); *see also Ismart Int'l Ltd. v. I-Docsecure, LLC*, No. C-04-03114, 2005 WL 588607, at *8 n.5 (N.D. Cal. Feb. 14, 2005) ("[T]he parties have cited no law, statutory or otherwise, providing that third party beneficiaries can similarly be sued by parties to a contract"); *Nat'l Rural Telecommunications Co-op. v. DIRECTV, Inc.*, 319 F. Supp. 2d 1059, 1068 (C.D. Cal. 2003) ("[A] third party beneficiary does not have a duty to perform under the contract and, thus, cannot be sued for breach"). Therefore, I need not determine whether Defendant was a third-party beneficiary to the APA, as it is irrelevant to the question of whether it can be sued for breach.

However, New York courts have, under limited circumstances, found non-signatory parent companies liable for the breach of their signatory subsidiaries "if the parent's conduct manifests an intent to be bound by the contract." *Warnaco Inc. v. VF Corp.*, 844 F. Supp. 940, 946 (S.D.N.Y. 1994). This inquiry is a "contract-based claim[]" and courts analyzing this issue with respect to a contract with "a New York choice of law provision," will apply New York law provided the choice of law provision is valid, as it is here. *Clarke v. TRIGO U.S., Inc.*, No. 22-CV-1917, 2023 WL 2456814, at *2 (S.D.N.Y. Mar. 10, 2023).

This theory provides for the possibility of liability "if the parent's conduct manifests an intent to be bound by the contract, which intent is inferable from the parent's participation in the negotiation of the contract, or if the subsidiary is a dummy for the parent, or if the subsidiary is controlled by the parent for the parent's own purposes." *Clarke,* 2023 WL 2456814, at *3 (quoting *Horsehead Indus., Inc. v. Metallgesellschaft AG*, 239 A.D.2d 171, 172 (1997)). This intent differs from the specific intent to escape liability relevant to the alter ego inquiry in that it asks about the parent entity's intent in contracting with the sellers, rather than the parent's intent in creating its subsidiary. *Id.* ("The assessment of the non-signatory's intent to be bound is premised upon 'objective manifestations' and the 'totality' of the words and deeds expressed as of the time of entry into the agreement." (quoting *RUS, Inc. v. Bay Indus., Inc.*, No. 01-CV-6133, 2004 WL 1240578, at *20 (S.D.N.Y. May 25, 2004), *aff'd sub nom. Recticel Foam Corp. v. Bay Indus., Inc.*, 128 F. App'x 798 (2d Cir. 2005))).

Here, there is no question that Oaktree did not "objectively manifest [] an intent to be bound," by the contract, *RUS,* 2004 WL 1240578, at *20, it signed in November 2011. (AC ¶ 1.) This must be the case for many of the reasons outlined *supra* § IV.D. Regardless of whether the Teleios Entities were created for the purpose of defrauding or otherwise to wrong the sellers and their successors, they were certainly created for the purpose of signing the APA and shielding Oaktree from liability in some capacity. Oaktree would hardly have gone through the trouble of creating the Teleios Entities if it still intended to be bound by the APA.

To argue otherwise, Plaintiff largely relies on inapposite caselaw from the third-party beneficiary context. (Opp'n 18–19.) As mentioned previously, whether or not Oaktree can fairly be said to be a third-party beneficiary of the contract, I cannot find any manifestations of an "intent to be bound," given the presence of APA § 9.08, titled "Third-Party Beneficiaries",

which provides that the APA "will inure to the benefit of and be binding upon the parties signatory hereto" and that "except as otherwise provided in this contract, no other Person will have any right or obligation hereunder," and the other facts surrounding the creation of the Teleios Entities in August and September of 2011. *See supra* § I. Nowhere does the APA provide a duty to Oaktree whose breach would be enforceable by Plaintiff beyond the claim that the Teleios Entities are mere alter egos of Oaktree.

Nothing in the APA itself or in the circumstances surrounding the signing of the APA evinces that the parties intended for Oaktree to be bound by the contract in contravention of the inurement clause the parties signed. That the contract provided for mail sent to the Teleios Entities to be sent to Oaktree, (AC ¶ 74), required Oaktree to "contribute funds" for the purchase, (*id.* ¶ 76), and required Oaktree to provide quarterly reports to the Sellers, (APA § 2.01(e)), does not prove that Oaktree intended for the contract to impose legally enforceable duties upon it.

Indeed, the creation of the Teleios Entities demonstrates Oaktree's intent not to be bound by the APA. Plaintiff may well be able to show, through discovery, that the Teleios Entities were created with a surreptitious and unlawful purpose in mind. *See supra* § IV.D. However, with the Teleios entities having been created, Plaintiff cannot now plausibly allege that, at the time the APA was executed, Oaktree manifested an intent to be bound by it. Therefore, any claims that sound in the "intent to bound" or third-party beneficiary theory must dismissed, and Oaktree's motion to dismiss any breach of contract claims predicated on such a theory is GRANTED.

### F. *Successor Liability*

Plaintiff also argues that Oaktree should be held liable to the APA for breach of contract as its successor.  (*See* Opp'n 20–22.)  Plaintiff claims that Oaktree is "a mere continuation of" the Teleios Entities as it "impliedly assumed the liabilities of the Teleios entities," or, in the alternative, because it "absorb[ed]" the "proceeds from Teleios' sale of the Conveyed Assets." *Id.*  Successor liability is an exception to the general rule that "when one company sells or transfers all of its assets to another company, the acquiring company generally does not become liable for the debts or liabilities of the seller/transferor." *Tommy Lee Handbags*, 971 F. Supp. 2d at 378.  "Specifically, Delaware recognizes four exceptions to the general rule against successor liability:  '(1) the purchaser expressly or impliedly assumes such obligations; (2) the transaction amounts to a consolidation or merger of the seller into the purchaser; (3) the purchaser is merely a continuation of the seller; or (4) the transaction has been entered fraudulently.'" *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MC-2543, 2017 WL 3382071, at *17 (S.D.N.Y. Aug. 3, 2017) (quoting *Elmer v. Tenneco Resins, Inc.*, 698 F. Supp. 535, 540 (D. Del. 1988)).  Here, Plaintiff alleges that Oaktree is a successor "under either the *de facto* merger or mere continuation theories."  (Opp'n 21.)  Both arguments fail.

 "The elements necessary to create a *de facto* merger under Delaware law are the following:  (1) one corporation transfers all of its assets to another corporation; (2) payment is made in stock, issued by the transferee directly to the shareholders of the transferring corporation; and (3) in exchange for their stock in that corporation, the transferee agreeing to assume all the debts and liabilities of the transferor." *Magnolia's at Bethany, LLC v. Artesian Consulting Eng'rs Inc.*, No. S11 C–04–013, 2011 WL 4826106, at *3 (Del. Super. Ct. Sept. 19, 2011).  Here, Plaintiff concedes that he cannot meet this test.  Plaintiff may argue that "Teleios

did transfer its assets to Oaktree," (Opp'n 20), but he cannot credibly claim that all of Teleios's assets were transferred directly to Oaktree, when, in the same paragraph, he admits that "Oaktree caused Teleios to sell the remaining Conveyed Assets to third parties." *Id.* The fact that Oaktree may have received the profits of the sale from those assets does not make those proceeds the same as the previously held assets themselves any more than the landlord of a shopkeeper can be said to own the goods previously conveyed by the shopkeeper to his customers just because the proceeds are used to pay rent.

The mere continuation exception mirrors the de facto merger doctrine. Indeed, "[s]ome courts have observed that the mere-continuation and de-facto-merger doctrines are so similar that they may be considered a single exception. *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 45 n.3 (2d Cir. 2003) (collecting cases). "The mere continuation exception applies where it is not simply the business of the original corporation which continues, but the corporate entity itself and there is a common identity of directors, stockholders, and the existence of only one corporation at the completion of the transfer." *Martin Hilti Fam. Tr. v. Knoedler Gallery, LLC*, 386 F. Supp. 3d 319, 351 (S.D.N.Y. 2019) (quoting *Silverman Partners LP v. Verox Grp.*, No. 08-CV-3103, 2010 WL 2899438, at *5 (S.D.N.Y. July 19, 2010) (alterations adopted)). Plaintiff has failed to point to any cases in which the mere continuation exception may apply in the face of explicit proof that not all assets were transferred directly from the old corporation to the new corporation. This follows from the case law, since the mere continuation exception "envisions a common identity," between the old and new corporations, *Colon v. Multi-Pak Corp.*, 477 F. Supp. 2d 620, 627 (S.D.N.Y. 2007) (internal quotation marks omitted), and that "'the new entity is so dominated and controlled by the old company that separate existence must be disregarded.'" *Ghim Li Int'l Pte. Ltd. v. Am. Fashion Network Imports, Inc.*, No. 17-CV-974,

2019 WL 1380432, at *7 (N.D.N.Y. Jan. 31, 2019) (quoting *Magnolia's at Bethany, LLC*, 2011 WL 4826106, at *3).  Here, whatever claims Plaintiff may have about the formation of the Teleios Entities, there is no cognizable argument that Oaktree, admittedly "one of the largest distressed securities investors in the world with approximately $164 billion in assets under management," (AC ¶ 6), either shares a common identity with the now-defunct Teleios Entities, or that the Teleios Entities, the "old company," "dominate[] and control[]" Oaktree.  *See Ghim Li Int'l Pte. Ltd.*, 2019 WL 1380432, at *7.  If anything, Plaintiff's alter ego claims run exactly to the contrary.  *See supra* § IV.D.

Oaktree is therefore correct that Plaintiff's successor liability theory is not plausibly alleged.  Plaintiff's cause of action based on successor liability is dismissed, and Oaktree's motion to dismiss claims based on that theory is GRANTED.

### G.  *Unjust Enrichment and Money Had and Received*

Plaintiff also brings quasi-contract claims for unjust enrichment and money had and received.  These claims are improperly brought, given the existence of a valid contract, and so must be dismissed.  *See New Paradigm Software Corp. v. New Era of Networks, Inc.*, 107 F. Supp. 2d 325, 329 (S.D.N.Y. 2000) (when "both parties agree that a valid and enforceable contract exists between them, Plaintiff may not plead the quasi-contractual theory of unjust enrichment."); *Fishman v. Philadelphia Fin. Life Assurance Co.,* No. 11-CV-1283, 2016 WL 2347921, at *13 (S.D.N.Y. May 3, 2016) ("[E]xistence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.") (quoting *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987)).  The parties do not dispute that the APA was a valid contract.

Defendant's motion to dismiss Plaintiff's Second and Third Causes of Action is GRANTED.

### H. *Covenant of Good Faith and Fair Dealing*

Plaintiff further advances a claim for breach of the implied covenant of good faith and fair dealing. However, "[a] claim for breach of the implied covenant [of good faith and fair dealing] will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." *Doyle v. Mastercard Int'l Inc.*, 700 F. App'x 22, 24 (2d Cir. 2017) (summary order) (quoting *ICD Holdings S.A. v. Frankel*, 976 F. Supp. 234, 243–44 (S.D.N.Y. 1997)); *see also Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 203–04 (2d Cir. 2013). Here, Plaintiff alleges ostensibly the same facts to support both the breach of contract claim and the fair dealing claim. (*Compare* AC ¶¶ 88–89, *with* AC ¶ 106.) Therefore, Oaktree is correct to argue that Plaintiff's Fourth Cause of Action is "duplicative of his breach of contract claim and should be dismissed." (Mot. 20–21.)

Therefore, Oaktree's motion to dismiss Plaintiff's Fourth Cause of Action is GRANTED.

### I.  *Accounting*

Plaintiff also claims he is entitled to an accounting.  "[A]n accounting is an equitable remedy that requires the existence of a fiduciary relationship, a joint venture, or other special circumstances between the plaintiff and the defendant warranting equitable relief."  *Underdog Trucking, LLC, Reggie Anders v. Verizon Servs. Corp.*, No. 09-CV-8918, 2010 WL 2900048, at *8 (S.D.N.Y. July 20, 2010).  "The right to an accounting rests on the existence of a trust or fiduciary relationship regarding the subject matter of the controversy at issue."  *Akkaya v. Prime Time Transp., Inc.*, 845 45 A.D.3d 616, 617 (2007) (quoting *Town of New Windsor v. New Windsor Volunteer Ambulance Corps, Inc.*, 16 A.D.3d 403, 404 (2005)) (collecting cases).  Here, Plaintiff does not plead a fiduciary duty or cite any case that supports the imposition of an accounting without such a duty.  Instead, he merely claims he "is entitled to an accounting because [he] provided property to Defendants."  (Opp'n 24.)  Indeed, the one case that Plaintiff cites in support of his claim for an accounting included both "claims of breach of fiduciary duty and accounting."  *Beck v. CIT Grp./Credit Fin., Inc.*, No. 95-CV-5800, 1998 WL 655547, at *2 (S.D.N.Y. Sept. 24, 1998).  Because Plaintiff fails to allege a fiduciary duty, his claim for an accounting fails.

Defendant's motion to dismiss Plaintiff's Fifth Cause of Action is GRANTED.

### J.  *Timeliness*

Defendant also argues that Plaintiff's lawsuit is untimely because the initial breach of contract was alleged to have occurred in January 2017 and this lawsuit was not brought until February 2023.  New York typically applies a six-year statute of limitations to contract cases, commencing at the time of the time of the breach.  N.Y. C.P.L.R. §§ 203(a), 213(2); *Deutsche Bank Nat. Tr. Co. v. Quicken Loans Inc.*, 810 F.3d 861, 865 (2d Cir. 2015) ("New York's six-

year limitations period on contractual claims generally runs from the time the contract was breached.").

However, "where 'claims [are] premised on a continuing wrong, . . . each successive breach may begin the statute of limitations running anew.'" *Fioranelli v. CBS Broad. Inc.*, 551 F. Supp. 3d 199, 256 (S.D.N.Y. 2021) (quoting *Mindspirit, LLC v. Evalueserve Ltd.*, 346 F. Supp. 552, 593 (S.D.N.Y. 2018); *see also Guilbert v. Gardner*, 480 F.3d 140, 150 (2d Cir. 2007) ("If . . . a contract requires continuing performance over a period of time, each successive breach may begin the statute of limitations running anew.") (collecting cases). Here, Plaintiff alleges that the APA contemplated continuing performance during and throughout 2017 and 2018. (Opp'n 25 (citing AC ¶ 44).) I therefore reject Defendant's argument that Plaintiff's claims are untimely, and Oaktree's motion to dismiss on this basis is DENIED.

**V.    Conclusion**

Plaintiff may proceed with his breach of contract cause of action based on an alter ego theory. Defendant's motion to dismiss is GRANTED as to all other claims.

Defendant's motion to seal Exhibit 8 to the proposed amended complaint and corresponding references in Plaintiff's First Amended Complaint is GRANTED.

The Clerk of Court is respectfully directed to terminate the open motions at Docs. 61 & 63.

SO ORDERED.

Dated: February 17, 2026
        New York, New York

*Vernon Broderick*
_____
Vernon S. Broderick
United States District Judge